UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                                                                           :

UNITED STATES OF AMERICA,      :

                                                                           :

             - v. -                     :            15 Cr. 386 (JGK)

                                                                           :

CORY HARRIS,                            :

                                                                           :

                                                                           :

                       Defendant.        :

------------------------------------------------------- x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

                                                                     PREET BHARARA
                                                                     United States Attorney for the
                                                                     Southern District of New York
                                                                     One Saint Andrew's Plaza
                                                                    New York, New York 10007

Andrew C. Adams
Hadassa R. Waxman
Margaret S. Graham
Assistant United States Attorneys
      *- Of Counsel -*

## PRELIMINARY STATEMENT

In advance of the March 20, 2017, trial of Cory Harris ("Harris" or the "defendant"), the Government respectfully submits the instant motions *in limine* for rulings by the Court on the following issues.  *First*, the Government moves to admit, through the testimony of various cooperating witnesses, certain statements from Harris' co-conspirators within the narcotics distribution conspiracy charged in Count One of the S7 Superseding Indictment (the "Indictment").  The Government intends to offer statements made by members of that conspiracy – including narcotics dealers, sellers, and co-conspirators involved in the protection of Harris' narcotics distribution through the use and possession of firearms – in furtherance of the charged narcotics distribution conspiracy, which are admissible under Federal Rule of Evidence 801(d)(2)(E).  *Second*, the Government moves for the admission of certain statements made by the victim of the murder underlying Counts Three through Six.  Those statements constitute admissions that were against that unavailable witness's penal interest, and are therefore admissible under Federal Rule of Evidence 804(b)(3).  *Third*, the Government moves to preclude cross-examination as to certain prior acts committed, or allegedly commited, by particular Government witnesses, as set forth in more detail below.

## BACKGROUND

The evidence at trial will show that Harris was a large-scale narcotics distributor based in the Lower East Side of Manhattan and in Brooklyn from at least in or about 2012 through the date of his arrest in this case on or about June 24, 2015.  Harris supplied multiple customers with both personal-use and resale quantities of crack, heroin, marijuana, and prescription pills, which Harris sourced from different suppliers in and around the New York area.  Harris maintained "stashes" of his drugs in and around the Lower East Side, including in the basement of 119 Henry Street and various locations within 45 Rutgers, New York, New York.  In those same

stash locations, Harris maintained multiple firearms, including handguns and at least one larger assault rifle, used for protection of Harris' narcotics supply.  At trial, the Government expects to elicit testimony regarding those firearms, and to offer certain of those firearms, which were seized from 119 Henry Street in April of 2012, into evidence.  In addition, the Government intends to demonstrate Harris' prolific narcotics distribution through the testimony of cooperating witnesses and through the admission of the content of Harris' personal cellular telephone, seized at the time of his arrest in this case and containing conversations relating to Harris' sales of narcotics.

Certain cooperating witnesses first knew of Harris as their neighborhood marijuana dealer, from whom the purchased marijuana as early as 2012.  Beginning in the fall of 2014, other members of Harris' conspiracy obtained crack, heroin, marijuana and Percocet in Manhattan, the Bronx and Brooklyn, including from Harris, and then transported those narcotics to Vermont for distribution in local apartments and hotel rooms. Those co-conspirators – several of whom will testify at Harris' trial – provided heroin, crack, and other controlled substances to young women in the Bennington area who then became low-level members of the narcotics conspiracy, assisting in retail sales and providing the co-conspirators with the transport, storage, and distribution of crack, heroin, marijuana and Percocet.  Those women, moreover, provided apartments from which the co-conspirators were able to sell narcotics supplied by Harris and others, as well as telephones from which seller-members of the conspiracy contacted customers in the Bennington area.  Among the narcotics dealing members of the conspiracy who used these apartments and phones, and who also used Harris as a narcotics supplier, was co-defendant Frank Jenkins, Jr.

The Government expects that cooperating witnesses will describe Harris' use of, and access to, guns for the purpose of enforcing his control over narcotics stashes in the Lower East Side.  For example, Harris stored weapons alongside his narcotics stashes.  Moreover, on at least one occasion prior instigating the plot to murder Rashaun Nicholson, as charged in Counts Three through Six of the Indictment, Harris demonstrated that access to, and willingness to use, firearms for that purpose by attempting to contract with another individual to murder someone whom Harris believed had stolen narcotics from one of Harris' principal sources of supply.

That same inclination toward violence in support of his narcotics business resulted in the death of Nicholson on December 28, 2014.  Multiple cooperating witnesses will testify regarding the circumstances and motivation for Harris' decision to pay Jenkins to murder Nicholson, whom Harris had until shortly before the murder considered a close friend.  In sum and substance, those cooperating witnesses will testify that Harris suspected that Nicholson had stolen marijuana and firearms from a stash location that Harris controlled and then failed to return or repay Harris for those drugs and guns.  In retaliation for that offense, Harris offered Jenkins approximately $2,500 to murder Nicholson; Jenkins agreed.

Harris and Jenkins, along with a cooperating witness, lured Nicholson to the Lower East Side on the day of the murder.  Armed with a 9mm firearm, which Jenkins had purchased from another Vermont-based co-conspirator, Jenkins approached the victim, with whom he was familiar, and killed him with a single gun-shot to the head from close range.  Photographs of the victim's body demonstrate a stippling pattern around his eye, which the Government expects to demonstrate constitutes a sign that Jenkins was able to position himself very close to his victim for the shot.  That fact, coupled with the orderly way in which the victim had placed several packages and food containers on the ground immediately before being shot, corroborates the

expected testimony that will establish that Jenkins – an associate of and familiar face to the victim – in fact murdered Nicholson.  Ballistics evidence will further corroborate witness testimony regarding the caliber of gun that Jenkins used to commit the murder, and historical cell site information will provide a geographic representation of the routes by which Jenkins and Nicholson came together on December 28, 2014, again corroborating a cooperating witness's account of the murder.[1]

In the aftermath of the murder, the narcotics distribution conspiracy continued apace, and both Harris and Jenkins made statements to the co-conspirators to apprise them of the status of the conspiracy insofar as it involved the punishment of a perceived thief, *i.e.*, Nicholson.  For example, the Government expects that two cooperating witnesses will describe Jenkins' post-murder statements regarding a then-unpaid debt owed to Jenkins by Harris for the murder, as well as statements by Jenkins describing the motivation and manner in which the murder was committed.

---

[1] The Government will offer this geolocation information and related mapping through an investigative analyst employed at the United States Attorney's Office, who has analyzed geolocation data relating to certain cellular telephones relevant to this case.  The Government has made an expert disclosure to defense counsel regarding this analyst's testimony, and understands, based on conversations with defense counsel, that the expert qualification of this witness will not be opposed.

**ARGUMENT**

I.  **The Court Should Admit Various Co-Conspirator Statements Made During the Course of, and in Furtherance of, the Charged Violent Narcotics Conspiracy**

The Government expects that various cooperating witnesses will testify about statements made to them by members of the violent narcotics conspiracy of which Harris was a part while the cooperating witnesses themselves were members of the conspiracy. In particular, the Government expects to elicit testimony falling into two principal categories, which the Government submits are co-conspirator statements admissible under Rule 801(d)(2)(E): (a) statements made by members of conspiracy in the lead-up to acts committed to protect the continued operation of that conspiracy, or while those acts were being committed; and (b) statements made by members of the conspiracy about acts committed as part of the conspiracy, where the statements were made during the conspiracy, but after the acts in question had occurred. For each of these categories of co-conspirator statements, the Government has provided examples below, which are intended to be illustrative, not exhaustive.

A.  **Applicable Law**

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment"

4

or that is the subject of the relevant trial. *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *United States* v. *Ulbricht*, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing *United States* v. *DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993)); *see also United States* v. *Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment"), *cert. denied sub. nom. Ramirez-Talavera* v. *United States*, 501 U.S. 1211 (1991).

When determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States* v. *Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily* v. *United States*, 483 U.S. 171, 181 (1987)).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek

5

to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States* v. *Thai*, 29 F.3d at 813; *see also Dresna*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted).  For example, in *United States* v. *Lozano-Reyes*, the Second Circuit affirmed the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." *United States* v. *Lozano-Reyes*, No. 95-1707, 1996 U.S. App. LEXIS 14182, at *5 (2d Cir. June 12, 1996).  Or, as another example, in *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991), the Second Circuit affirmed the district court's admission of co-conspirator statements, through the testimony of a cooperating witness, about a murder that had already taken place.  The district court there permitted a cooperating witness to testify that four separate members of the enterprise acknowledged their participation in a murder of a debtor to the organization.  *Id*.  The court of appeals explained that Rule 801(d)(2)(E) permitted the

cooperating witness testimony about these conversations because "discussions of [the] murder and, the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members." *Id*. "Because these statements may have promoted cohesiveness among the Crew and helped induce Crew member assistance in the affairs of the criminal enterprise, the district court did not abuse its discretion in admitting the disputed testimony." *Id*. (emphasis added); *see also United States* v. *Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators); *United States* v. *Ruggiero*, 726 F.2d 913, 923-24 (2d Cir. 1984) (statements made by co-conspirator Ruggiero reporting defendant Santora's role in a homicide were admissible against Santora).

### B. Discussion

The Government respectfully submits that the following categories of co-conspirator statements are admissible against Harris under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Illustrative examples of each category of co-conspirator statement are provided in the discussion below.

At trial, the Government intends to introduce, through cooperating witnesses who were members of Harris' narcotics distribution conspiracy (as retail dealers supplied by Harris or larger-scale dealers also supplied by Harris), certain statements made by other members of the same narcotics conspiracy, including by drug dealers and more violent "enforcers" within the conspiracy. These statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy" and thus should be admitted under Rule 801(d)(2)(E). *See Rivera*, 22 F.4d at 436. Principally, these statements will consist of declarations by co-conspirators, *e.g.*, Jenkins, that their narcotics supplies were provided by Harris, who

7

similarly supplied the cooperating witnesses and other members of the conspiracy based in Vermont.  Similarly, statements made to cooperating witnesses by other members of the conspiracy, apart from Harris, include statements regarding money or firearms owed to Harris by other members of the same conspiracy.  These discussions of supplies and payments are quintessentially statements designed to "facilitate[] the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958.

Statements about events *after* crimes were committed, when made by one co-conspirator to another during the course of the conspiracy, are admissible as co-conspirator statements.  These statements are designed to "apprise a co-conspirator of the progress of the conspiracy," *Rahme*, 813 F.2d at 36; *see also Desena*, 260 F.3d at 158; *see also United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (explaining that "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current development and problems facing the group" (internal quotations omitted)).  The Government anticipates introducing numerous statements, including by Jenkins and another un-charged member of the narcotics conspiracy who was also present for Nicholson's murder ("CC-1"), regarding the circumstances that culminated in the murder of Nicholson.  Those statements will include admissions by Jenkins that he had "caught a man down," meaning that he had murdered a person, that he had done so in exchange for approximately $2,500, and that a 9 mm firearm that he attempted to foist on other members of the conspiracy was "hot," meaning that it had recently been used in criminal activity.  Each of those statements was made regarding a central event in the life of the narcotics conspiracy – the murder of Nicholson at Harris' direction in order to punish Nicholson for the theft of narcotics and firearms from Harris' stash.  Such

statements are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E),[2] as they informed and updated the testifying cooperators (former members of the conspiracy) on the status and progress of the conspiracy and the status of the tools used to protect its success, *see Desena*, 260 F.3d at 158, and they "serve[d] to foster trust and cohesiveness" between all of the co-conspirators, each of whom was now apprised of a particularly violent crime committed on

---

[2] These statements by former confederates of the testifying cooperators, such as Jenkins' statement that he had "caught a man down" (referring to the murder of Nicholson), are also admissible as statements against penal interest under Federal Rule of Evidence 804(b)(3), because each of these statements was "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.; see also United States* v. *Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) ("[T]o satisfy [the penal interest] exception [to the hearsay rule], the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." (quoting *United States* v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir.1983) (internal quotation marks and citations omitted)). A subpoena for testimony was served on Jenkins via his counsel on February 22, 2017; he is expected to refuse to testify, relying on the Fifth Amendment's protections against self-incrimination, and therefore will be unavailable as that term is used in Rule 804. Counsel for Jenkins will relate Jenkins' position after consulting with Jenkins.

behalf of the crew.[3]

## II. The Court Should Admit Out-of-Court Statements of Rashaun Nicholson as Statements Against Nicholson's Penal Interest

The Government expects that a civilian witness will testify regarding certain out-of-court statements made by Nicholson to that witness in the weeks prior to his murder, many of which will be offered for their truth. In particular, the Government expects that this witness will explain that Nicholson admitted to that witness that Nicholson stole guns and marijuana from Harris, and that Nicholson did so because he believed Harris had cheated Nicholson out of money during a dice game. That witness will further testify that Nicholson claimed to have smoked the marijuana and to have sold the firearms to a third-party living outside of New York State.

These statements, coupled with testimony of cooperating witnesses corroborating Nicholson's account, establish Harris' motivation for the Nicholson murder. They link Harris' revenge to Nicholson's trespass on Harris' narcotics stash and Nicholson's theft of firearms that Harris used to protect and promote his drug trade. They are all admissible as statements against Nicholson's penal interest under Federal Rule of Evidence 804(b)(3). *First*, Nicholson is unavailable. *Second*, his statements tended to incriminate him in a theft, as well as in the possession of narcotics and the unlicensed sale of firearms across state lines. Nicholson was, moreover, a convicted felon as of 2002, which makes his possession of firearms that he

---

[3] In contrast, Harris' own statements about this event, of which several will be presented at trial, are admissible under Federal Rule of Evidence 801(d)(2)(A) as party-opponent admissions that are offered against him.

10

personally moved across state lines for the purpose of resale a violation of 18 U.S.C. § 922(g)(1). As were Jenkins' statements, as described above, each of these statements by Nicholson was "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3); *see also United States* v. *Wexler*, 522 F.3d at 202 ("[T]o satisfy [the penal interest] exception [to the hearsay rule], the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." (quoting *United States* v. *Katsougrakis*, 715 F.2d at 775 (internal quotation marks and citations omitted)). In this case, the nature of the statements themselves are so contrary to Nicholson's penal interest as to warrant admission under Rule 804. Moreover, these statements are corroborated by other cooperating witnesses' accounts of the motivations behind the murder, including the anticipated testimony of one cooperating witness that Harris himself explained the murder thusly: "That's what happens when people steal."

### III. The Court Should Preclude Cross Examination on Certain Alleged Bad Acts and Admitted Prior Incidents of Domestic Violence

#### A. Factual Background

Certain cooperating witnesses who will testify at Harris' trial have been previously accused of certain bad acts, including harassment and domestic violence.

***Incident at Issue for CW-1.*** With respect to the Government's first cooperating witness ("CW-1"), CW-1 was convicted on or about November 18, 2010, in New York Supreme Court, New York County, of two counts of Harassment in the Second Degree, Class A misde-

11

meanors, for which he was sentenced to an order of protection.  CW-1 admits the facts of these incidents, and has explained that CW-1's mother kicked him out of the house and, when CW-1 returned, CW-1 engaged in a physical fight with CW-1's boyfriend, resulting in the charges of harassment.

*Incident at Issue for CW-2*:  With respect to the Government's second cooperating witness ("CW-2"), on or about December 2011, CW-2 and CW-2's love interest were together at a New Year's Eve party. CW-2 left the party and CW-2's love interest followed, at which time CW-2 and the love interest began to argue.  The love interest struck CW-2, and in response, CW-2 hit the love interest in the face, causing her glasses to fall off and leaving a bruise under her eye.  Several months later, the love interest obtained an order of protection against CW-2.  On or about January 22, 2012, and again on February 8, 2012, the love interest reported to NYPD that CW-2 had sent her a number of text messages, and called her in violation of the order of protection.  CW-2 was arrested and ultimately pled guilty to Criminal Contempt in the Second Degree, and Aggrevated Harrassment, both class A misdemeanors, for which he was sentenced to time served.

*Incidents at Issue for CW-3*: .

### B.    Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the right of a defendant in a criminal case to be confronted with the witnesses against him.  *Delaware* v. *Van Arsdall*, 475

U.S. 673, 678 (1986); *United States* v. *Maldonado Rivera*, 922 F.2d 934, 955 (2d Cir. 1990). "This means more than being allowed to confront the witness physically, for the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross examination." *Maldonado Rivera*, 922 F.2d at 955 (internal quotation and citations omitted).

The Confrontation Clause does not, however, deprive the trial judge of all discretion in setting limits on cross examination during trial. Rather, it is well settled that "the scope and extent of cross-examination lies within the sound discretion of the trial judge." *United States* v. *Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990). As the Supreme Court has held:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.. . . [T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Van Arsdall*, 475 U.S. at 679 (citation and quotation omitted) (emphasis in original); *accord United States* v. *Laljie*, 184 F.3d 180 (2d Cir 1999). In this regard, "a trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *Scarpa,* 913 F.2d at 1018 (quotation omitted). "'Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witnesses' safety, or interrogation that is repetitive or only marginally relevant.'" *United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003), *cert. denied*, 124 S. Ct. 239 (2003) (quoting *Van Arsdall*, 475 U.S. at 679).

Rule 608(b) of the Federal Rules of Evidence limits cross-examination regarding "specific instances of a witness's conduct" to situations where the conduct of the witness was "probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Thus, Rule 608(b) "'does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness.'" *United States* v. *Schlussel*, No. 08 Cr. 694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (quoting *United States* v. *Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005)). Moreover, "Fed. R. Evid. 608(b) prohibits a party from presenting 'extrinsic evidence' of '[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility' unless that conduct was the subject of a criminal conviction." *United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003).

Courts have often held prior domestic violence offenses to fall within the category of bad acts that are not probative of a witness's character for truthfulness, and which are therefore not appropriate fodder for cross examination. *See, e.g.*, *United States* v. *Jeffers*, 402 F. App'x 601, at *1 (2d Cir. Dec. 2, 2010) (affirming District Court's determination that purported acts of domestic violence were not probative of defendant's credibility); *United States* v. *Fama*, No. 12 Cr. 186 (WFK), 2012 WL 6094135, at *1-*2 (E.D.N.Y. Dec. 7, 2012) (precluding cross examination on prior acts of domestic violence both because they are not probative of truthfulness, and because they are unduly prejudicial). Similarly, the Second Circuit long ago noted that it is proper for a District Court to preclude questioning of a prosecution witness regarding sex crimes as having an insufficient bearing on the witness's credibility. *See United States* v. *Rosa*, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it an abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility"); *United States* v. *Rabinowitz,* 578 F.2d 910, 912 (2d Cir. 1978) (District Court

properly precluded questions regarding "prior acts of sodomy upon young children" because such acts did not bear on the witness's credibility).

"Further, under [Federal Rule of Evidence] 403, the district court may exclude even relevant evidence if it finds that the probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* (internal citations and quotation omitted); *see also, e.g.*, *United States* v. *Gambardella*, No. S2 10 Cr. 674 (KBF), 2011 WL 6314198, at *2 (S.D.N.Y. Dec. 15, 2011) (precluding cross examination on witness's prior acts of domestic violence where its probative value would be substantially outweighed by the danger of prejudice before the jury).

### C. Discussion

The defense will have ample opportunity to cross-examine these cooperating witnesses (CW-1, CW-2, and CW-3), and other Government witnesses, regarding their motivations, credibility, and (to the extent relevant) prior bad acts. For example, as part of their cooperation, CW-1, CW-2, and CW-3 have each admitted extremely serious crimes including narcotics trafficking and gun possession in furtherance thereof (and including, in the case of CW-3, involvement in the same murder that underlies Counts Three through Six as charged against Harris). Each will be testifying in hopes of receiving leniency at sentencing — all of which will provide ample fodder for the defense to cross-examine these witnesses. The Court should preclude cross-examination as to the narrow set of incidents set forth above because they are particularly lacking in probative value respecting each witness's truthfulness while being particularly inflammatory.

The narrow set of incidents that the Government seeks to bar questioning about — which are confined to allegations or incidents of domestic violence, a dismissed robbery allegation, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – – do not bear on these witnesses' credibility, and have no relevance to the crimes charged. There can be no proper use of cross-examination about this conduct; its only possible purpose would be to alienate and inflame the jury to a degree that might render it unable properly to assess the credibility of these witnesses. In short, cross-examination on these subject should be barred as it would likely confuse the jury without adding any probative value. Inquiring about allegations or incidents of domestic violence, an unproven robbery allegation, and an unproven sexual misconduct allegation involving a minor will only inflame the jury and "is not indicative" of each respective witness's truthfulness on the stand. *See United States* v. *Nosov*, 221 F. Supp. 2d 445, 449 (S.D.N.Y. 2002) ("In general, '[c]ross examination concerning immoral acts and acts of sexual perversion may be properly excluded by a trial judge who determines they are not probative of the witness's veracity.'" (quoting *United States* v. *Devery*, 935 F. Supp. 393, 408 (S.D.N.Y. 1996) (Preska, J.)); *United States* v. *Rabinowitz*, 578 F.2d at 912 (trial court properly excluded cross examination into the witness's prior acts involving the sodomy of young children). Indeed, such testimony's probative value is greatly outweighed by the danger of unfair prejudice. *Nosov*, 221 F. Supp. 2d at 449. (noting that "fellow judges in this district have held that crimes such as rape and murder have little bearing on a witness's capacity for truthfulness.").

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motions *in limine* in their entirety.

Dated: New York, New York
March 1, 2017

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____/s/_____
Andrew C. Adams
Hadassa R. Waxman
Margaret S. Graham
Assistant United States Attorneys