H37dharc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          15 Cr. 0386(JGK)

5   CORY HARRIS, et al.,

6              Defendants.

7   ------------------------------x

8
                                          March 7, 2017
9                                         10:18 a.m.

10
    Before:
11
                    HON. JOHN G. KOELTL,
12
                                          District Judge
13

14                     APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    BY:  ANDREW C. ADAMS
17       MARGARET S. GRAHAM
            Assistant United States Attorneys
18
    BOBBI C. STERNHEIM
19  GRAINNE O'NEILL
        Attorneys  for Defendant
20

21

22

23

24

25

H37dharc

| | |
|---|---|
| 1 | THE CLERK:  United States of America versus Corey |
| 2 | Harris. |
| 3 | Will all parties please state who they are for the |
| 4 | record. |
| 5 | MR. ADAMS:  Good morning, your Honor.  Andrew Adams |
| 6 | and Margaret Graham for the government. |
| 7 | MS. STERNHEIM:  Good morning, your Honor.  Bobby C. |
| 8 | Sternheim and Grainne O'Neill for Corey Harris, who is present |
| 9 | at counsel table. |
| 10 | MS. O'NEILL:  Good morning. |
| 11 | THE COURT:  Good morning. |
| 12 | I note that Mr. Harris is present. |
| 13 | A couple of -- several matters at the outset.  First, |
| 14 | I saw Ms. Sternheim in the cafeteria this morning.  We |
| 15 | exchanged good mornings.  Nothing about that affects anything |
| 16 | that I do in the case. |
| 17 | MS. STERNHEIM:  Your Honor, I disclosed that to the |
| 18 | government.  And I apologize, I realize that I should treat you |
| 19 | as a juror as well, and I will note that during the pendency of |
| 20 | this matter. |
| 21 | THE COURT:  Thank you.  It's why I try not to go into |
| 22 | the lunchroom while I have a case on, but, as I say, nothing |
| 23 | about that affects anything that I do in the case. |
| 24 | MS. STERNHEIM:  Your Honor, I don't want to in any way |
| 25 | deprive you of your coffee.  I'm just kidding.  I will make |

H37dharc

1    sure --

2           THE COURT:  No.  Please.  I don't do it not only in

3    order to avoid seeing defense counsel but also to avoid seeing

4    government counsel.  So I treat my interactions with the

5    parties in the same way that, as you mentioned, I ask the

6    parties to treat interactions with the jurors.  And so I simply

7    try to avoid the situations where that might occur, and when it

8    occurs, I just bring it to the attention of the parties.  So,

9    not a problem.

10          Second, the government made a submission to me

11   yesterday, which I returned and said, through my deputy, that

12   any submission which is ex parte has to include an explanation

13   why it's ex parte.  And so it was resubmitted, and I signed an

14   order, which is now ex parte, under seal, and is either filed

15   under seal or shortly will be.  But I also, through my deputy,

16   said to the government that any ex parte submission, there

17   should be a notice that the government has made an ex parte

18   submission so that it is in the file that the government made

19   an ex parte submission, and I haven't seen the notice that an

20   ex parte submission was made.

21          MR. ADAMS:  Your Honor, I apologize.  I understood the

22   order to be to alert Ms. Sternheim, which I did.  But I'm happy

23   to send a confirmatory letter to the Court that I did make that

24   indication.

25          THE COURT:  OK.  The reason for that is there should

H37dharc

 1    be a notice in the file.  OK.

 2              There was a notice from defense counsel that the

 3    defense counsel wanted to make a correction in a defense

 4    submission?

 5              MS. STERNHEIM:  Yes, your Honor.  I know the Court

 6    prefers faxes, but I discovered this in transit and just wanted

 7    to alert the Court and the government that there were a couple

 8    of typos, let's say, in our submission which I recited in the

 9    email.  In our haste to get it to the government and to file

10    it, it wasn't caught, and I just wanted to raise that.

11              If the Court wishes me to go through --

12              THE COURT:  Oh, I see.  OK.

13              MS. STERNHEIM:  It should guide you paragraph by line.

14              (Pause)

15              THE COURT:  OK.  No, I see the changes.

16              MS. STERNHEIM:  Thank you.

17              THE COURT:  OK.  As a preliminary note, I mean, it

18    seems clear to me that I'm not going to be able to resolve all

19    of these issues today, and it would be wise to have a final

20    pretrial conference on the Friday before trial, and you may

21    have a better sense of the 3500 material also by that time.

22              MR. ADAMS:  Yes.  Your Honor, just for the Court's

23    information, we have met with defense counsel after our

24    conference yesterday and had a discussion about 3500 material

25    and the timing of production.

1          With respect to cooperating witnesses, in fact, with

2    respect to all of the 3500 we have today, what we intend to do

3    is provide it to defense counsel this Friday.  With respect to

4    cooperating witnesses and civilian, non-law enforcement

5    witnesses, we have an understanding and an agreement with

6    defense counsel -- and they can confirm this for me -- that

7    until the 17th, that is, the Friday before the trial begins,

8    that material will be maintained on an attorneys'-eyes-only

9    basis, and on the 17th the material will be fully available to

10   Mr. Haris as well.  But in order to give defense counsel

11   sufficient time to prepare any further supplements to the

12   motions in limine for that final pretrial conference and to

13   conduct their own investigation, we will be producing on

14   Friday -- this Friday.

15          THE COURT:  OK.

16          MS. STERNHEIM:  Your Honor, that is accurate.

17          I just wanted to request that when the Court sets the

18   time for the hearing on March 17th, I'm not sure of the time of

19   it but I have been invited to in a citizenship induction in the

20   building that morning of a very special young man and I would

21   like to be able to attend that.

22          THE COURT:  Sure.  It is usually around 11 o'clock

23   and --

24          THE CLERK:  Friday the 17th at 2:30?

25          THE COURT:  Do you prefer it -- how about 2:30?

H37dharc

1          MS. STERNHEIM:  That would be fine, if convenient.

2     Thank you very much.

3          THE COURT:  OK.  So final final pretrial conference

4     March 17 at 2:30 p.m.  OK.

5          So, I now have the defense response to the

6     government's motion in limine and the government response to

7     the defense motion.

8          Taking first the government motion, there is agreement

9     that the procedure to be followed with respect to alleged

10     co-conspirator statements would be if there is an objection to

11     a statement and the government seeks to admit the statement for

12     its truth as a co-conspirator statement, I would take it

13     subject to connection and instruct the jury that what it means

14     to be taken subject to connection is that the jury can consider

15     the statement for its truth unless at some point I told the

16     jury that they are not to consider it, that they are to strike

17     it from their consideration.  And at the conclusion of the

18     government's evidence I would make the determination whether

19     the government has shown by a preponderance of the evidence

20     that those statements were made during and in furtherance of a

21     conspiracy by a co-conspirator of a conspiracy of which the

22     defendant was a member.

23          It should be obvious that if there are -- and you all

24     know this, but if there are out-of-court statements, the

25     statements might be offered not for the truth, in which case if

H37dharc

in fact that's true that they are not being offered for the
truth, the issue of co-conspirator statements doesn't even
arise.  So if during the trial there are objections and it's
the government examining and the government says not for the
truth and if in fact it's not for the truth, I would instruct
the jury that they are to consider the statement but not for
its truth.  And I would give the jury an instruction about what
that means and what hearsay means and tell them that, of
course, I decide all evidentiary issues and they don't have to
be concerned about evidentiary issues, but at least the
distinction of whether a statement is being offered for the
truth of the statement, or not for its truth, is something that
at least they should understand.  So if the government says not
for its truth and if indeed it's not for its truth, for
example, its effect on the defendant if the statement was made
in the defendant's presence, and if there were an objection and
the government says not for the truth and indeed it's not for
the truth, I would simply advise the jury that the statement is
not being offered for its truth.

        If the government says, no, we are offering it for the
truth but under an exception, the government doesn't have to
spell out and shouldn't spell out the reason for the exception.
If it's sufficiently clear that it's being offered as a
co-conspirator statement, then the government can either say
"Subject to connection" or "Yes, we are offering it for the

H37dharc

1   truth," and if it's apparent that it is an alleged

2   co-conspirator statement, then I will tell the jury that it is

3   being offered subject to connection.

4           MS. STERNHEIM:  Your Honor, may I just respond to --

5           THE COURT:  Sure.

6           MS. STERNHEIM:  -- one thing that the Court said with

7   regard to the procedure to be followed?

8           THE COURT:  Sure.

9           MS. STERNHEIM:  One thing that you said that concerns

10  me in instructing the jury at the close of the government's

11  case, quote --

12          THE COURT:  No.  I didn't say that I would instruct

13  the jury at the close of the government's case.  I said I would

14  have to make a finding --

15          MS. STERNHEIM:  Oh, I apologize, then.

16          THE COURT:  No.  No.  No.  The jury would not be

17  informed than any finding was made.

18          MS. STERNHEIM:  Thank you.  I misheard.

19          THE COURT:  The finding that the Court makes is out of

20  the presence of the jury.  The only thing that the jury is told

21  is that a statement is being taken subject to connection, which

22  means that the jury may consider the statement for its truth

23  unless at some point in the trial I tell the jury not to

24  consider the statement, strike it from the jury's attention.

25  And if eventually I find that the statement is a co-conspirator

H37dharc

statement, the jury is never advised of that; they just -- they
are never told that they cannot consider it, that they have to
strike it from their consideration.

          MS. STERNHEIM:  Thank you.

          THE COURT:  No.  I would never tell the jury that I've
made that finding.

          MS. STERNHEIM:  I just misheard it, Judge.

          THE COURT:  OK.  We then turn to the Nicholson
statement.

          The defendant raises several issues with respect to
the Nicholson statement that require a government response, and
now you have a little time to give me a response.  The first
issue is the alleged spousal privilege, which raises two
questions.  One is is it right that the statements by Nicholson
were to a spouse, and, if so, can they be admitted despite the
fact that they were made at a time that they were subject to a
spousal privilege?

          MR. ADAMS:  Your Honor, I'm happy to respond to both
now.

          THE COURT:  Let me just -- I might as well finish.

          MR. ADAMS:  Sure.  Sorry, your Honor.

          THE COURT:  The other question that arises then is
also if in fact they're made to a spouse and may be subject to
the spousal privilege, the question is whether Nicholson, as
the declarant, could reasonably believe that such statements

1   subjected him to possible penal consequences so that the

2   statement is a statement against penal interest.  If in fact

3   there is a reasonable argument that the statement could never

4   be used against him, could it reasonably be a statement against

5   penal interest?

6          In effect, those are the two issues that arise under

7   the spousal privilege issue.

8          The second set of issues is the defendant fairly says

9   that the statements have to be carefully parsed to determine

10  which are the statements against penal interest and which

11  statements go beyond statements against penal interest, and so

12  the government in its response should be precise as to what the

13  statements are so that I can make a determination of which

14  statements by Nicholson, if they are admitted as statements

15  against penal interest, are in fact against penal interest and

16  which are not in which -- so the government may also want to

17  brief the question how integral to the statement is the

18  context.  So, could you parse a statement so fine as the

19  defendant would have me do so you could have a statement that

20  Nicholson stole guns and marijuana without saying that, here's

21  the context, he stole guns and marijuana from Harris?  There

22  doesn't seem to be an issue with respect to smoke marijuana or

23  sold firearms, but there is an issue at least with respect to

24  the circumstances under which he stole guns and marijuana.

25         The third issue, as I see it on the Nicholson

H37dharc

1     statement, is the defense says it's important that the indicia

2     of reliability go to the declarant, the out-of-court declarant,

3     Nicholson, and not to the person reporting Nicholson's

4     statements.  The jury can assess that credibility.  But it

5     would appear that the government's original submission did go

6     to what are the indicia of reliability for the statement,

7     because the government says it has other people who are going

8     to testify that what Nicholson said was in fact truthful; there

9     will be other evidence in the case to support the reliability

10    of the statements by Nicholson.

11         So that at least is a third issue which the defense

12    raises.

13         OK.  Mr. Adams, what would you like to tell me?

14         MR. ADAMS:  Your Honor, of course we'll take the

15    opportunity to brief it more thoroughly and give the precise

16    statements.

17         What I anticipate the core of our argument with

18    respect to the questions that you've raised to be is, first,

19    that the Second Circuit has pretty squarely ruled that the

20    marital privilege does not act as a bar on penal interest.  And

21    I can give you two citations now --

22         THE COURT:  Yes, by all means.

23         MR. ADAMS:  The first, the more recent one, is U.S. v.

24    Persico.  It's 645 --

25         THE COURT:  Hold on.  I would have done this myself

H37dharc

1  but your submission came in pretty late.  645?

2          MR. ADAMS:  It did.  I'm sorry, your Honor.

3          645 F.3d 85.

4          THE COURT:  I should say, Ms. Sternheim's submission

5  came in pretty late.  645 F.3d?

6          MR. ADAMS:  85.

7          THE COURT:  OK.

8          MR. ADAMS:  In fairness, both of our submissions came

9  in pretty late, your Honor.

10          THE COURT:  True.  But I haven't gotten to yours yet.

11          MR. ADAMS:  And I'm just looking for the -- I believe

12  the pincite is 102.

13          THE COURT:  OK.

14          MR. ADAMS:  And this is a case that involved a proffer

15  of a statement against penal interest.  It involved a statement

16  by one spouse to the other.  The Second Circuit said, "Nor does

17  the fact that the statement was made to the declarant itself

18  provide the basis for ruling that it is not within this hearsay

19  exception," and the statement was properly admitted.

20          It cites to a second -- another Second Circuit case,

21  the pronunciation of which I'm likely to butcher, but it's

22  United States v. Katsougrakis, K-a-t-s-o-u-g-r-a-k-i-s.  That's

23  715 F.2d 769.  And, again, this case deals with a statement

24  that it was both against penal interest and a co-conspirator

25  statement, but the Second Circuit affirmed its admission under

1    either exception.  The pincite I believe is 777 in that case.

2              THE COURT:  OK.

3              MR. ADAMS:  And it stands for essentially the same

4    proposition.  And I think that the reason for that is the rule

5    doesn't require that the statement be immediately admissible in

6    court irrespective of any potential claim of privilege, but

7    that the statement tends to incriminate or be against

8    somebody's penal interest.  In the event that, for example, the

9    statement -- the way the privilege was waived, for example, or

10   if the spouse had provided the statement irrespective of an

11   interest or the privilege to law enforcement, that statement

12   would tend to incriminate the person whether or not the

13   statement itself is subject to the privilege.  I think the

14   Second Circuit grapples with that to some extent in both of

15   those cases.

16             With respect to --

17             THE COURT:  And is it true that the spousal privilege

18   in and of itself doesn't prevent the spouse from testifying to

19   the statement?

20             MR. ADAMS:  So setting aside the -- just so that we're

21   talking about the same privilege, not speaking about the

22   spousal testimonial privilege but the marital privilege for

23   confidential communications among spouses, the privilege may

24   well have been something that Mr. Nicholson could have invoked.

25   Irrespective of that, the Second Circuit has squarely said that

that context plays no role in the hearsay analysis with respect
to penal interest.

THE COURT:  OK.

MR. ADAMS:  Again, we'll parse out the precise
statements.  What I expect them to consist of will be a
statement that he, as you said, stole guns and marijuana from
Mr. Haris.  I'd say the context of that is integral in a number
of ways.  One of them is it's against his penal interest to
steal guns.  It's against his penal interest to steal
marijuana.  It's against his pecuniary and proprietary interest
to steal those things from Mr. Haris, that is, to take them
from another person, another specific person.  And, moreover,
just the fact that he is taking what are clearly illegal
firearms, in the context of Mr. Haris' role as a narcotics
dealer, only heightens his own penal exposure, I would think.

THE COURT:  No, but the issue would be -- it is
against penal interest to steal guns and marijuana.  The
question would be whether the addition of stealing them from
Harris is also against penal interest or whether that could be
severed.

MR. ADAMS:  I don't believe it can realistically be
severed.  The context here is integral in a couple of respects.
One is just by itself, the person from whom I stole
something -- or the person from whom I took this thing, if you
don't know who Mr. Haris is or why he was in possession of

H37dharc

1    those things, you might not understand that taking the thing

2    from Mr. Haris was in itself more than likely an illegal act.

3    If you just take Mr. Haris' bag of apples, then you have no

4    idea of whether or not that is an illegal thing.  But by

5    specifying it's from this guy, Mr. Harris, given who Mr. Haris

6    is --

7              THE COURT:  No, but it's not "took apples," it's stole

8    guns and marijuana.

9              MR. ADAMS:  Yes, sir.  But now in trying to parse it

10   out, I think now you're just looking at the phrase "from

11   Harris."  I did X with respect to Harris.  What Mr. Haris --

12   who Mr. Haris is informs -- not only corroborates the fact that

13   he would have had to steal the items in order to take them,

14   which is another element of the 804 analysis, but also further

15   informs why it would be against his pecuniary and proprietary

16   and penal interest to take these things from this particular

17   man.

18             THE COURT:  OK.  But that's pecuniary interest, not

19   penal interest, right?  If you steal guns and marijuana from

20   anyone, it's against your penal interest.

21             MR. ADAMS:  That's correct.  If you steal guns that

22   are themselves illegally obtained, taken across state lines,

23   there is a further penal interest that I would think you would

24   be worrying about at that point.

25             THE COURT:  There must be cases with respect to

H37dharc

whether statements have to be parsed that way.  I mean, we're talking here about statements that were made in the past by a person now deceased, and if a witness would fairly testify that here's the statement as I heard it, he stole guns and marijuana from Harris, if that's in fact the statement, is the "from Harris" itself integral to the "stole guns and marijuana"?  Is it necessary to parse the statement so fine?  Does the statement become incomplete or misleading in any way to excise it if a witness would fairly testify this is what he said and I remember it because it was, you know, that was part of what I remember from the statement?  There must be cases precisely on point that talk about whether the statement has to be edited before a witness testifies to it.

MR. ADAMS:  Thank you, your Honor.  We'll certainly brief that.

I will say that in the cases that I've looked at, they are not parsed nearly so finely.  In <u>Katsougrakis</u> in particular the statements include things like the person who made the statement said that he and another person were to be paid $3,000 for torching a diner.  That statement in its entirety was admissible.  But obviously the fact that I torched a diner alone or with somebody else, both of those would be against my penal interest.  The Court didn't parse it nearly so finely.

And then finally with respect to the indicia of reliability, in this case I get the sense that the defense is

H37dharc

1    trying to have it both ways.  Both the fact that this is a

2    marital communication speaks to its reliability.  That's one of

3    the reasons why a privilege would exist were Mr. Nicholson on

4    trial; the privilege exists to foster that reliability and

5    confidence.  But apart from the internal reliability of the

6    statement, what the government has and will proffer is

7    co-conspirator statements offered through different witnesses,

8    in this case statements by the shooter as well as statements by

9    Mr. Haris himself, that corroborate the fact that the motive

10   for this murder was Mr. Haris' theft from -- I'm sorry,

11   Mr. Nicholson's theft from Mr. Haris.

12           So those external factors along with the internal

13   factors and the statement itself we think support the

14   reliability in this case.

15           THE COURT:  OK.

16           MR. ADAMS:  Your Honor, would you -- is there a

17   particular date by which you would like briefing?

18           THE COURT:  Well, when can you reasonably have it?

19   Thursday?

20           MR. ADAMS:  Yes, sir.  Not a problem.

21           THE COURT:  Do you want to be heard on this,

22   Ms. Sternheim?

23           MS. STERNHEIM:  Your Honor, if the Court would commit,

24   I'd like to review what the government is going to submit.  It

25   may impact the response that I give.

H37dharc

1          THE COURT:  Sure.

2          MS. STERNHEIM:  My silence at this moment is in no way

3    an agreement.

4          THE COURT:  Sure.

5          MS. STERNHEIM:  But I will also do some further

6    research into this.

7          THE COURT:  OK.  If you could send me something by

8    Friday, that would be helpful, after you've seen what the

9    government does on Thursday.

10          MS. STERNHEIM:  Your Honor, I am --

11          THE COURT:  Monday?

12          MS. STERNHEIM:  I am -- if I could just?  I'm

13    attending the annual CJA conference and then will be in a

14    facility in Texas on Monday.  May I just have until early

15    Tuesday morning?

16          THE COURT:  Sure.  Tuesday.

17          OK.  Then we have the prior bad acts of -- alleged

18    prior bad acts of CW-1, -2 and -3.

19          The government makes a powerful argument, based on the

20    cases, that the kind of misconduct alleged with respect to

21    CW-1, -2 and -3 is the kind of conduct that courts have said

22    should not be admitted under Federal Rule of Evidence 608 as

23    impeachment.  The defense responds that these are acts of

24    violence, but doesn't point to any cases, and it's not clear

25    that just because something is an act of violence it goes to

H37dharc

credibility under Rule 608.  The parties -- ultimately, the

defense says why don't you wait until we see the 3500 material

and we can make further arguments.

         OK.  We can address it again at the final pretrial

conference after the defense has had an opportunity to review

the 3500 material, and in the subsequent submissions the

parties are welcome to address these issues.  But the defense

gives me no cases to suggest that this kind of information

should not be excluded from possible cross-examination.  It's

also, one would think, unlikely that the 3500 material would

not disclose for cooperating witnesses far more relevant prior

acts that would be the basis of cross-examination.

         As I read the submissions on CW-1, CW-2 and CW-3,

these are not past bad acts for which -- and the parties can

correct me if I'm wrong -- these witnesses would be subject to

prosecution today so that as a result of their cooperation

agreement they're getting something for their testimony.  There

were prior convictions of CW-1 and CW-2.  And as to CW-3 the

events occurred in 2005 and charges were dropped.  So it

wouldn't appear that as a result of their cooperation agreement

CW-1, -2 or -3 are getting anything with respect to these

events.  So the only basis for cross-examination is that the

events themselves reflect on credibility, and the defense

suggests no cases that support that proposition.

         The parties have briefed this as only a 608 issue.

It's also a 609 issue, isn't it, because there were convictions

of CW-1 and CW-2 for harassment and for CW-2 criminal contempt

and aggravated harassment?  And under 609, those convictions

must be admitted if the elements require establishing a

dishonest act or false statement.  But there is nothing about

these convictions that suggest that that's correct.  So under

either 608 or 609 it wouldn't appear to be that these incidents

are properly subject to cross-examination.

But of course I'll await the further argument and the

production of the 3500 material, and I should be able to rule

on these incidents at the final pretrial conference.  So if

anyone wants to give me anything else on these incidents, you

are welcome to do so.

Anyone else want to be heard on CW-1, -2 and -3?

MR. ADAMS:  Nothing to add, your Honor.

MS. STERNHEIM:  No.  Thank you.

THE COURT:  OK.  There is then the defense motion and

the government response.  There are two parts to this.  The

first is the prior dealings of the co-conspirators with the

defendant in connection with drugs and guns prior to 2012, the

date that the indictment lists as the start of the conspiracy.

I had one question.  In the government's response, the

government focuses on prior dealings with respect to drugs but

not with respect to guns.  Would there also be prior dealings

with the defendant with guns?

H37dharc

1            MR. ADAMS:  Your Honor, in the following respect.

2    What we expect the testimony to be that would take us before or

3    prior to 2012 generally is cooperating witnesses who are

4    familiar with Mr. Haris from the neighborhood.  So they know of

5    him from an approximate date.  I expect that that will

6    generally be around 2012.  I think that some of the witnesses

7    may say they knew him slightly before that, or knew of him

8    before that, and that the entire time that they knew him they

9    knew him to be, at the very least, the sort of local marijuana

10   dealer, and as they got to know him, they knew him to be a more

11   prolific narcotics trafficker, and that throughout the time

12   they knew him he carried guns on him while he dealt drugs.

13           So there is not going to be any sort of precision with

14   respect to the dates here, but our position generally is what

15   they're describing is not some different or earlier conspiracy,

16   it is the same conspiracy that continued to exist during the

17   charged timeframe.

18           THE COURT:  OK.  I can go over it again, but it

19   certainly appears that that proffered testimony would fall

20   squarely within the cases that support the admissibility of

21   testimony concerning how co-conspirators came to know the

22   defendant and that such testimony would be proper direct

23   evidence of the conspiracy itself.  "Where the indictment

24   contains a conspiracy charge, uncharged acts may be admissible

25   as direct evidence of the conspiracy itself."  United States v.

H37dharc

1    Diaz, 176 F.3d 5279 (2d Cir. 1999).

2         "It is within the trial court's discretion to admit

3    evidence of prior acts to inform the jury of the background of

4    the conspiracy charged in order to help explain how the illegal

5    relationship between participants and the crime developed or to

6    explain mutual trust that existed between co-conspirators."

7    Diaz.  Also, United States v. Rosa, 11 F.3d 315, 334 (2d Cir.

8    1993).

9         So, the proffered testimony at this point appears to

10   be admissible, and there is no reasonable 403 argument against

11   the admissibility of that testimony.  It's relevant.  It's not

12   unduly prejudicial.  It's not unfairly prejudicial.  It is

13   similar to the evidence that would be admitted with respect to

14   the conspiracy itself.  It's no more inflammatory than the

15   evidence of the conspiracy itself.  So at this point I don't

16   see a reasonable objection to the admissibility of that

17   testimony.

18        The second issue, then, is the attempt to -- alleged

19   attempt to get Hood to kill Flea.  And as to that I thought

20   that in the government's submission it would tell me how that

21   evidence would go in and why my suggestion of simply deferring

22   it until trial, where I could make a more reasonable

23   determination of the 403 issue, I thought that the government

24   was going to tell me something about the timing of the proposed

25   testimony, because it makes so much sense to defer that issue

H37dharc

1    until, at the very least, the latter part of the government's

2    case.

3         If the government had some problem with that in terms

4    of where it fit into the witnesses whom the government intends

5    to call, I thought that the government would be explaining that

6    to me in their submission, because I thought the government

7    said they thought that my suggestion was in fact a reasonable

8    and prudent suggestion and if there was a problem with it, I

9    thought that the government would let me know.

10        MR. ADAMS:  No, your Honor.  I apologize.  We did

11   think that the suggestion was reasonable and that we -- my

12   understanding, based on our discussion yesterday, was that we,

13   the government, would go forward on the understanding that

14   we'll put together a witness order that facilitates the Court's

15   ability to gauge the overall case.

16        THE COURT:  Fine.

17        MR. ADAMS:  So I apologize for not getting into it in

18   the letter.

19        THE COURT:  Never necessary to apologize.

20        MR. ADAMS:  I do anticipate -- I will say the way that

21   I expect that this to come in will be through -- if it comes in

22   will be through two particular cooperating witnesses.  I

23   anticipate that it will not be efficient on our part to put

24   both of those witnesses at the back end of the trial.  I expect

25   at least one of them would probably be an earlier witness in

1    the trial, given sort of his overall knowledge of the

2    conspiracy is a good witness as sort of someone to paint the

3    whole picture.  So with that in mind, we may well ask to recall

4    that witness at the end of the case, if need be, and if we have

5    permission to put in this evidence that we think is more proof

6    of the same conspiracy.

7                THE COURT:  OK.  In that connection, you should --

8    maybe you've done this already, but you should review Colon

9    because there is a long footnote in Colon which explains -- I

10   realize this is not being offered as 404(b) evidence, it's

11   being offered as direct evidence, but the footnote in Colon

12   explains that it's wise to defer 404(b) evidence until

13   rebuttal.  And if the defense doesn't present a case, the

14   government can still reopen to present 404(b) evidence if the

15   Court makes the 404(b) and 403 analysis.  And an instruction to

16   the jury is appropriate, the gist of which is under the rules

17   of evidence, this evidence could not have been admitted before

18   now in order to avoid any inference that the process was

19   somehow improper.  And I just suggest to you it's helpful to

20   review the footnote.

21                MR. ADAMS:  Thank you, your Honor.

22                And one other thing that I would note.  We did brief

23   it as 403 for today's purposes.  I think I mentioned yesterday

24   that depending on the defense tactics or arguments or line of

25   cross-examination, there may well be a 404(b) reason to offer

H37dharc

1    the same, but for the moment we see it as just proof of the

2    charged conspiracy.

3            THE COURT:  Direct evidence rather than 404(b)

4    evidence?

5            MR. ADAMS:  Yes, sir, but with the reservation that I

6    can imagine particular lines of cross or argument that would

7    change our view on how it should be viewed.

8            THE COURT:  OK.  Well, then the answer on this issue

9    is clear at this point.  The government should not refer in

10   openings or in the evidence to this incident, the alleged

11   attempt to get Hood to kill Flea, and shouldn't present any

12   evidence on that without raising the issue with the Court, at

13   which time the parties can argue out whether it's direct

14   evidence, whether it is 404(b) evidence at that point, and the

15   403 analysis.

16           MR. ADAMS:  Thank you, your Honor.

17           THE COURT:  Do you want to be heard on that,

18   Ms. Sternheim?

19           MS. STERNHEIM:  Not at this moment.  Thank you.

20           THE COURT:  OK.

21           I think that completes the issues.  Anything further?

22           MR. ADAMS:  Nothing for the government.

23           MS. STERNHEIM:  No.  Thank you.

24           THE COURT:  OK.  See you all on Friday, the 17th.

25                                    -   -   -