H36WharC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                        15 Cr. 386 (JGK)

CORY HARRIS,
a/k/a "Hop," a/k/a "P,"

                                        Arraignment
          Defendant.

------------------------------x

                              New York, N.Y.
                              March 6, 2017
                              11:00 a.m.

Before:

                  HON. JOHN G. KOELTL,

                                District Judge

                        APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
ANDREW C. ADAMS
HADASSA R. WAXMAN
MARGARET S. GRAHAM
    Assistant United States Attorneys

BOBBI C. STERNHEIM
GRAINNE E. O'NEILL
    Attorneys for Defendant

H36WharC

1          (Case called)

2          THE COURT:  Good morning.

3          The first item is the arraignment of the defendant on

4    the superseding indictment, S7, so I'll arraign the defendant.

5          Are you Cory Harris?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Are you being represented by Bobbi

8    Sternheim?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Have you seen a copy of the superseding

11    indictment against you, S7 15 Cr. 386 (JGK)?

12          THE DEFENDANT:  Yes, I have it right here in front of

13    me.

14          THE COURT:  Have you discussed it with your lawyer?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Did you read the indictment?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you want me to read the indictment

19    aloud to you in open court, or do you give up -- or waive --

20    the reading of the indictment?

21          THE DEFENDANT:  I'll waive it.  We went over it.

22          THE COURT:  How do you plead to the charges against

23    you in the superseding indictment; guilty or not guilty?

24          THE DEFENDANT:  Not guilty.

25          THE COURT:  All right.  The defendant's plea of not

H36WharC

1   guilty will be entered.

2          Now, I've scheduled for tomorrow a final pretrial

3   conference, but I've gone over the papers and it may be that

4   there are various items that I can deal with today.  If I can

5   deal with all of the items, it's possible that we won't need

6   the conference tomorrow, but I wanted to set the conference for

7   tomorrow in particular because I have motions *in limine* that

8   were filed by the government and by the defense.  I had thought

9   that the response date for the motions *in limine* was the end of

10  last week, but I don't have any responses to the motions *in*

11  *limine.*

12         MS. STERNHEIM:  Your Honor, we had requested a very

13  brief adjournment for the filing of them.

14         THE COURT:  Right, but there was no request for an

15  adjournment of the response date.

16         MS. STERNHEIM:  Based on my experience, I just assumed

17  naturally it would follow, and I apologize if it wasn't made

18  clear.

19         THE COURT:  OK.

20         MS. STERNHEIM:  But we are intending to file our

21  response hopefully today.

22         THE COURT:  OK.  Then I'll be able to deal with them

23  tomorrow, but if possible, the government should file any

24  response today also so that I can go over the responses from

25  both sides.

1          Ms. Sternheim, you're right, after I extended the date

2     for the motions, I certainly wouldn't hold you to the original

3     response date, so thank you for filing a response today.

4          MS. STERNHEIM:  You're welcome, your Honor.  And your

5     Honor, I just wanted the record to reflect that Grainne

6     O'Neill, who is now a full-fledged panel member, is trying the

7     case with me.

8          THE COURT:  OK.  How do you pronounce your first name?

9          MS. O'NEILL:  It's Grainne.

10         THE COURT:  Grainne?

11         MS. O'NEILL:  Yes, your Honor.

12         THE COURT:  OK.  The government had three motions *in

13    limine*.  The first was a motion which said, in essence, that

14    the government will seek to admit alleged coconspirator

15    statements, and I'll just make an observation with respect to

16    that.

17         The law is clear, under cases like United States v.

18    Geaney and United States v. Tracy, that if there's a sufficient

19    proffer by the government that alleged coconspirator statements

20    then should be received subject to connection, and if on the

21    basis of a preponderance of the evidence, the government shows

22    that the statements were made by a coconspirator during and in

23    furtherance of a conspiracy of which the defendant was a

24    member, then the statements should be accepted in evidence.

25    The procedure would be that if there is an objection to the

statements, I would receive them subject to connection and I
would tell the jury that the statement is received subject to
connection, which means that the jury can consider it unless at
some point I tell the jury that they are not to consider it,
that they're to strike the statement, they're not to consider
it.  And the jury would then be advised subsequently, after I
make my finding, that the statements are in fact admissible and
should not be stricken.

The second government motion *in limine* was statements
by Rashaun Nicholson that he was stealing from Mr. Harris,
which allegedly provided a motive for Mr. Harris to allegedly
cause the killing of Mr. Nicholson.  The government says that
these are statements against penal interests and therefore
admissible under the Federal Rules of Evidence, so I await what
the defense response is.

Then, the government says, they seek to preclude
certain cross-examination of cooperating witnesses 1, 2, and 3.
The impeachment would involve alleged sexual misconduct as well
as, it appears, an attempted robbery.

An observation:  The papers that I have refer with
some specificity to cooperating witness No. 1, cooperating
witness No. 2, cooperating witness No. 3.  The papers I have
are the ones that are filed on ECF and are redacted, so I don't
know what the details are.  The government should promptly
provide an unredacted copy of the papers to the Court, and I

1    have a question.

2            I'll wait and see what the defense has to say, but is

3    any of this cross-examination cross-examination that the

4    defense would otherwise intend to use?

5            MS. STERNHEIM:  Your Honor, without knowing who these

6    people are and what their background is like, it's a little

7    difficult to respond, but in our view, sexual assault is

8    violence, and to minimize it because it is violence against

9    women in a scenario where the individuals who will be

10   testifying to it are engaged in violence sets a standard that

11   we believe is unfair.  If it was violence against a

12   coconspirator, it would come in.  If it's violence against a

13   woman, arguably, from the government's position, it should not

14   come in, so we can't necessarily respond to that fully until we

15   have seen 3500 material or heard the testimony on direct

16   examination of these witnesses.

17           THE COURT:  OK.  What about an assault against another

18   man, not a coconspirator?

19           MS. STERNHEIM:  Assault is violence.  Violence is at

20   the heart of this indictment.  Once again, I would have to see

21   what the background of the witness is to see whether it is

22   probative.  Certainly if the Court were to leave this open, we

23   understand that there would be a review and rulings at an

24   appropriate time, but on a blank canvas, as we have now, it is

25   difficult for us to say yea or nay.

1          THE COURT:  All right.  I can listen to argument

2     tomorrow.  I could also, after argument, reserve until the 3500

3     material is produced.

4          When does the government intend to produce the 3500

5     material?

6          MR. ADAMS:  Your Honor, we are going to huddle with

7     defense counsel after this conference.  It had been our

8     intention with respect to the cooperating witnesses and the

9     civilian, as a result of safety issues, to produce the Friday

10     before the trial begins, but we're going to try to come some

11     protective measures so that we can produce that a little

12     earlier.  And just to narrow the issue with respect to the

13     request for preclusion, we are not seeking any longer to

14     preclude cross-examination on the attempted robbery.  The rest

15     is unchanged.

16          THE COURT:  OK.  Then there is the defendant's motion,

17     which seeks to preclude the government from introducing

18     evidence of the defendant's alleged effort to secure the murder

19     of Flea in 2004, first; second, preindictment sale of

20     narcotics; and third, the preindictment possession of a

21     firearm.

22          I plainly have to await the government's response.  My

23     initial question would be whether the government is seeking to

24     admit any of this evidence as 404(b) evidence.  Any answer to

25     that?

1          MR. ADAMS:  I'm sorry, your Honor.  No.  We're seeking

2     to offer it as evidence of the existence of a narcotics

3     conspiracy and firearms possession.

4          THE COURT:  You're seeking to admit it as direct

5     evidence, not as 404(b) evidence?

6          MR. ADAMS:  Not unless Mr. Harris places his character

7     at issue in some way that I'm not anticipating, but currently

8     it's direct evidence.

9          THE COURT:  404(b) evidence would not be admitted for

10    purposes of character, right?

11         MR. ADAMS:  Correct, your Honor.  We're seeking to

12    admit it as evidence of the existence of the conspiracy, access

13    to the firearms.

14         THE COURT:  But all of this is preindictment, isn't

15    it?

16         MR. ADAMS:  Yes, your Honor -- no.  I'm sorry.  The

17    activity is in 2014.  The indictment goes back to 2012.

18         THE COURT:  I'm sorry.  I said 2004, not 2014.

19         MR. ADAMS:  Yes, your Honor.

20         THE COURT:  Was that in furtherance of THE conspiracy

21    that's charged?

22         MR. ADAMS:  It is in furtherance of the narcotics

23    conspiracy, and it's proof of the defendant's possession of

24    firearms in furtherance of the same conspiracy, which is also

25    charged.  This is a separate allegation of a murder-for-hire in

H36WharC

1     relation to a separate theft, so this is not in relation to the

2     murder of Mr. Nicholson.

3               THE COURT:  No, I understand.  I got that.

4               MR. ADAMS:  OK.

5               THE COURT:  But the allegation is that it is an act in

6     furtherance of the narcotics conspiracy charged in Count One of

7     the indictment?

8               MR. ADAMS:  Yes, your Honor.

9               THE COURT:  OK.  What about the preindictment sale of

10    narcotics and the preindictment possession of the firearms?

11              MR. ADAMS:  With respect to both of those, what we

12    anticipate is testimony from cooperating witnesses about the

13    purchase of narcotics and the possession of firearms by

14    Mr. Harris that straddles pre and postindictment time-wise.

15    Certain people will say:  I knew him starting in or about 2012,

16    it may have been early 2011, and he was the neighborhood

17    marijuana dealer when I knew him, and I knew him to carry

18    firearms at that time.

19              It is, again, proof of the existence of the charged

20    conspiracy even if some aspects of the timeline that will be

21    testified about may predate the charged conspiracy.

22              THE COURT:  And so there isn't going to be any

23    argument in the government papers that this is 404(b) evidence,

24    that it is being admitted or sought to be admitted for motive,

25    intent, plan.

10

H36WharC

1          MR. ADAMS:  No, your Honor.  It is the existence of

2     the narcotics conspiracy.  We anticipate it will focus mostly

3     on the marijuana-sales aspect of the narcotics conspiracy.

4          THE COURT:  All right. I raise it because, among other

5     things, the cases draw a distinction between direct evidence

6     and 404(b) evidence, and if it's 404(b) evidence, the general

7     rule is that it ought to be reserved for rebuttal, and the

8     government has to be quite specific as to what the permissible

9     purpose is for the evidence.  But you tell me that when I read

10    the government papers, it's not going to rely on 404(b), right?

11         MR. ADAMS:  Correct, your Honor.  We anticipate that

12    it will be offered as direct evidence.

13         THE COURT:  Then the question is if in fact it's

14    direct evidence, the question becomes 403, and a central part

15    of some of the specific allegations in the case are the alleged

16    murder-for-hire of Mr. Nicholson, not the effort to murder

17    Flea, and the question then becomes whether the relevance is

18    substantially outweighed by the danger of unfair prejudice to

19    put in another effort, unsuccessful, at another

20    murder-for-hire, particularly in view of what the government

21    contends is the strength of its case with respect to the actual

22    murder-for-hire of Nicholson.  And then the question becomes

23    also if the real issue is 403, why should I make that decision

24    before trial?  Why shouldn't I treat it like 404(b) evidence?

25    If I think that the relevance of the attempted murder of Flea

H36WharC

is outweighed by the danger of unfair prejudice, given all of
the evidence in the case, why shouldn't I await the development
of that evidence at trial before making a decision about that
particular act, which is something the government can address
in its papers?

That also appears to relate to the issue of how the
government intends to prove that.  I mean, I can understand
that you wouldn't want to recall witnesses in order to prove
that, so that then becomes a question of how that's going to be
proved.

The defense says it wants documents, a witness list,
proffered testimony, which seems to go beyond what the case law
generally endorses in a criminal case, though I'm sure I could
order it, but a witness list and descriptions of witness
testimony is surely not generally part of discovery in a
criminal case, particularly in a case where there are
allegations of violence, though again, I'm sure that I have the
power to order that discovery.  But there was at least one item
that the defense mentioned, which seems to me to be clear.  If
the government has documents that it would otherwise intend to
use as part of its direct case with respect to that attempted
murder, those should be turned over.  Right?

MR. ADAMS:  Your Honor, there are no such documents.
This would be an entirely cooperator-based series of events.

THE COURT:  And so that information would be turned

H36WharC

over by 3500 material?

           MR. ADAMS:  Yes, your Honor.

           THE COURT:  The defense says it needs time to investigate this, that this is new, which would argue for reserving decision on this until trial, when I can make the 403 analysis and after the defense has had time to review the 3500 material and make any arguments with respect to the 403 analysis.

           MR. ADAMS:  Your Honor, I'd be happy to address the requested timing of the decision in our papers today.

           THE COURT:  I'm sorry?

           MR. ADAMS:  I'd be happy to address the timing of the requested decision in our papers today.  I would note that given that the Flea attempted murder-for-hire is based on cooperator evidence, what we would offer to the defense and what we have in our 404(b) notice letter is some information about what we understand that murder-for-hire attempt to have entailed.  In particular, what we've told defense is that Mr. Harris contacted and agreed with a person known as Hood to commit the murder.  To the extent that Mr. Harris knows Hood, I'm not sure what else the government can offer in terms of giving them a springboard for investigation, other than the 3500 material that we will discuss with the defense after today's conference.

           THE COURT:  Does that mean that Hood is the

H36WharC

1   cooperating witness?

2           MR. ADAMS:  No, your Honor, Hood is not a cooperating

3   witness.

4           THE COURT:  OK.  You're going to address timing in

5   your papers.  I want to see what you have to say and I want to

6   listen to defense counsel with respect to the motion, but why

7   isn't it the better course to defer until I hear more of the

8   evidence at trial and can make the 403 balancing analysis in

9   the same way that I would with 404(b) evidence?

10          MR. ADAMS:  Your Honor, I think that that's actually a

11  perfectly reasonable way to go about it.  I think that if we

12  can put in a letter today to sort of tee up the issues, the way

13  that this would come in would be through cooperating witnesses.

14  We can talk about witness order and the logistics of offering

15  this evidence or needing to recall a witness if it becomes

16  necessary, but I agree with the Court that your decision may

17  well rest heavily on the case as it comes in at trial.  But

18  again, I'm happy to offer a letter today just to sort of tee up

19  the issue.

20          THE COURT:  OK.

21          MR. ADAMS:  Thank you, your Honor.

22          THE COURT:  Anything defense counsel wants to add at

23  this point?

24          MS. STERNHEIM:  Just very briefly, Judge.  In response

25  to what else could the government provide other than 3500

H36WharC

1  material with regard to the other attempted murder-for-hire,

2  certainly the names of the individuals.  Giving us Hood and

3  Flea is a nonstarter as far as doing any investigation.  I

4  would at the very least ask for their government names and

5  anything else that would assist us in our investigation.

6              THE COURT:  Mr. Adams.

7              MR. ADAMS:  With respect to Hood, that one's easy.  We

8  don't know his government name.  With respect to Hood, we don't

9  know his government name.  That's not somebody we've

10  identified, so Hood is as clear as I can be on that.

11             We do have some further information about who Flea is.

12  Given the nature of the allegation, I'm not sure that the risk

13  to Flea's safety in this context merits handing over his full

14  identification.  Given that the conspiracy was not with Flea,

15  Flea may well have no idea that he was a target of a

16  murder-for-hire.  This was something between Mr. Harris and

17  Hood.  Mr. Harris presumably knows who Hood is, but again, in

18  speaking with defense counsel after this and in particular in

19  coming up with some schedules and protective measures for the

20  3500, I'm happy to raise this with them as well to see if we

21  can come to some accommodation without putting Flea at undue

22  risk.

23             THE COURT:  OK.  Anything else for now, Ms. Sternheim?

24             MS. STERNHEIM:  No, your Honor.

25             THE COURT:  OK.  Let me turn to the voir dire.  I've

H36WharC

1   reviewed the government voir dire.  Of course, I have the voir

2   dire that I've used in the past.  Please get my trial rules,

3   get my jury rules.  If you don't have them already,

4   Mr. Fletcher can give them to you right after this conference.

5          I intend to use four alternates, and I use, as you

6   probably know, the struck-panel method, so there will be 36

7   potential jurors in the box and the first two rows.  The first

8   28 will be the group for the 12 trial jurors plus 10

9   peremptories for the defense plus 6 for the government, which

10  equals 28.  There will be 4 alternates plus 2 peremptories for

11  the defense, 2 for the government, for a total of 8 for the

12  alternate pool, for a total of 36.

13         I'll examine the jurors generally and then individual

14  questionnaires with individual questions for all of the jurors.

15  If there is any issue that raises a potential challenge for

16  cause, I'll call the juror to the sidebar along with counsel.

17  The defendant has the right to be present at any sidebars; if

18  the defendant wishes, the defendant has the right to be present

19  at any sidebars.  If both sides agree on a challenge for cause,

20  I will probably agree and it will expedite the jury selection

21  process, so I urge you to agree on challenges for cause if

22  there is any juror that you think has a potential challenge for

23  cause.

24         When we get to the exercise of peremptories, the

25  defendant exercises 2 peremptories in the first 4 rounds; the

H36WharC

```
 1    government exercises 1.  In the last 2 rounds, each side
 2    exercises 1.  With respect to the alternates, each side has 2
 3    peremptories -- defendant, government; defendant, government --
 4    so 2 rounds of one peremptory each.  You can exercise your
 5    peremptories in any order, any numerical order, against the
 6    first 28 and then against the remaining 8 in the alternate
 7    pool.  You don't have to exercise your peremptories in
 8    numerical order.
 9              With respect to the exercise of peremptories, you have
10    to use your peremptory or peremptories in each round or lose
11    the peremptory.  You have to use it or lose it; you can't
12    reserve it.  After the exercise of all the peremptories against
13    the first 28 is over, the lowest 12 are your jury, so if you
14    were to pass with respect to any individual round, it would be
15    the equivalent of excluding the highest numbered juror, because
16    it's going to be the lowest 12 who are your jury, and the same
17    reasoning applies to the exercise of peremptories against the
18    alternates.
19              Any questions about the process?
20              MR. ADAMS:  Your Honor, I have a question just about
21    timing and the Court's hours and schedule.  I'm happy to talk
22    about it tomorrow if you'd prefer.
23              THE COURT:  No, no.  The first day of trial is March
24    the 20th, and I usually say 9:00.  I have an appointment, so
25    I'll say 9:30 on March the 20th.  Normally we sit from 9:30
```

H36WharC

1  until 12:45, with a break, and then from 2:00 to 4:30, with a

2  break.  I often sit Fridays half a day.  I would reserve Friday

3  afternoons for other matters.

4         I accept faxes.  If there are evidentiary issues that

5  you think are going to come up, please let me know in advance.

6  Send me a fax.  I'll meet with you before the jury comes in, at

7  lunchtime, or after the jury leaves, but please don't spring

8  evidentiary issues on me.  Let me know in advance.  As I say, I

9  accept faxes.  I'll meet with you early, I'll meet with you

10  late.  That's the schedule.

11         And I was going to get to this.  Originally I had

12  reserved four weeks for the trial.  When I read your proposed

13  voir dire, you say the trial is expected to last one or two

14  weeks.  Is that right, you're now estimating one to two weeks?

15         MR. ADAMS:  I think that's correct, your Honor.  Given

16  that we've streamlined a number of cooperators, we only have

17  the one defendant at this point, one to two weeks sounds more

18  likely.  With respect to the first week, if we have a jury at

19  the end of the first day and we're sitting a half day on

20  Friday, then I expect we'll probably go midway into the second

21  week.

22         THE COURT:  Rather than tell the jury about two weeks,

23  I'd be inclined to tell the jury less than three weeks.

24         MR. ADAMS:  Fair.  Thank you, your Honor.

25         MS. STERNHEIM:  Your Honor, at this point we can't

1  predict the length of our case, if any.

2          THE COURT:  What do the parties think about telling

3  the jury less than three weeks?

4          MR. ADAMS:  That's fine with the government, your

5  Honor.

6          MS. STERNHEIM:  It's fine.

7          THE COURT:  OK.  The outline of the case, in the voir

8  dire I would explain to the jury as follows:

9          "As I explained, this is a criminal case.  It is

10  entitled the United States of America v. Cory Harris.  The

11  defendant, Cory Harris, has been charged in an indictment

12  alleging the commission of six federal crimes.

13          "As I will explain, the indictment is not evidence

14  itself; it simply contains the charges against the defendant,

15  and no inference may be drawn against the defendant from the

16  existence of the indictment.  You must keep in mind always that

17  the defendant is presumed innocent, that he has entered a plea

18  of not guilty to the charges against him, and that the

19  government must prove beyond a reasonable doubt the charges in

20  the indictment.

21          "I'll summarize the charges now so that we can

22  determine whether you have any personal knowledge of them or

23  whether there is anything about the nature of this case which

24  may make it difficult for any of you to serve on the jury.

25          "Count One of the indictment charges that from in or

H36WharC

about 2012 through in or about 2015, Cory Harris conspired with

others to violate the narcotics laws of the United States,

specifically, to distribute and possess with intent to

distribute 280 grams or more of cocaine base in a form commonly

known as crack, 100 grams or more of heroin, and marijuana.

"Count Two charges that from in or about 2012 through

in or about 2015, Cory Harris used, carried, and possessed

firearms and aided and abetted the use, carrying, and

possession of firearms during and in relation to the drug

conspiracy charged in Count One and in furtherance of that

conspiracy.

"Count Three charges that in or about December of

2014, Cory Harris conspired with others to travel in interstate

commerce and to use the facilities of interstate commerce with

the intent that a murder be committed in consideration for

payment, and death resulted.  Specifically, Cory Harris agreed

to pay Frank Jenkins Jr. to murder Rashaun Nicholson and that

as a result, Jenkins shot Nicholson to death in the vicinity of

78 Catherine Street, New York, New York.

"Count Four charges that in or about December 2014,

Cory Harris, together with others, knowingly did travel in

interstate commerce and used the facilities of interstate

commerce with the intent that a murder be committed in

consideration for payment, and death resulted.  Specifically,

Cory Harris agreed to pay Frank Jenkins Jr. to murder Rashaun

Nicholson and that Jenkins shot Nicholson to death in the

vicinity of 78 Catherine Street, New York, New York.

"Count Five charges that on December 28, 2014, while

engaged in a conspiracy to distribute and possess with intent

to distribute 280 grams or more of crack cocaine, Cory Harris

intentionally and knowingly killed or caused the intentional

killing of Rashaun Nicholson in the vicinity of 78 Catherine

Street, New York, New York.

"Count Six charges that on or about December 28, 2014,

during and in relation to a narcotics-trafficking offense,

namely, the narcotics conspiracy charged in Count One, and in

furtherance of that conspiracy, Cory Harris used and carried a

firearm and aided and abetted the use of a firearm, and did,

through the use of a firearm and through aiding and abetting

the use of a firearm, cause the death of Rashaun Nicholson.

Specifically, Frank Jenkins Jr., at the direction and with the

assistance of Cory Harris, shot and killed Rashaun Nicholson in

the vicinity of 78 Catherine Street, New York, New York.

"Again, I remind you that the indictment reciting the

charges I have just summarized is not evidence of any kind.

Moreover, I've only summarized the charges.  I have not

detailed the elements of each of the offenses that the

government is required to prove beyond a reasonable doubt.  In

my final instructions, I will explain the charges in more

detail and explain the law to be applied to the facts that you,

H36WharC

1    the jury, find.

2                "Does any juror have any personal knowledge of the

3    charges in the indictment as I have described it?"

4                Is that satisfactory with both sides?

5                MR. ADAMS:  Yes, your Honor.

6                MS. STERNHEIM:  Yes.

7                THE COURT:  I now have a question, because it will

8    come up in the charge to the jury.  In the proposed description

9    of the case, in the voir dire that the government gave me, in

10   describing Count Five, the government added "and in doing so,

11   possessed, carried, brandished, and discharged a firearm,"

12   picking up a 924 firearms offense.  The charge in Count Five

13   doesn't contain that language, and the statutory citation is 21

14   U.S.C. 848(e)(1)(A) and Title 18, Section 2.

15               MR. ADAMS:  Your Honor, if I could, I believe we can

16   own that as a mistake, and the government would be happy to

17   offer a corrected instruction with respect to Count Five.

18               THE COURT:  You don't have to.  I read what I intend

19   to tell them.  At the least, the language "and in doing so,

20   possessed, carried, brandished, and discharged a firearm," you

21   can double-check, but I think where that probably came from is

22   an instruction under 924 rather than an instruction under 21

23   U.S.C. 848(e)(1)(A), but you should check that out to make sure

24   that an element of the crime that's charged in Count Five is

25   not picking up the language from 924.

H36WharC

1          MR. ADAMS:  Your Honor, I will check, but I believe

2     you are absolutely right.  That sounds like language picked up

3     from 924(c).

4          THE COURT:  Does the defense want to say anything

5     about that?

6          MS. STERNHEIM:  Your Honor, we're not prepared to

7     respond yet, having not fully absorbed that.

8          THE COURT:  Sure.

9          There is a question that the government wanted me to

10     ask, which I don't usually ask, so I'll ask for the defense

11     view.  The government asks the question, which I picked up:

12     "Does any juror own a gun?  Has any juror received training in

13     the use of firearms?  Does any juror believe that the laws

14     governing firearms possession should not be enforced?"

15          Is that information the parties want to be used in the

16     exercise for their peremptories?

17          MS. STERNHEIM:  Your Honor, I would like to have an

18     opportunity to respond more fully tomorrow, but I think you

19     would have to ask that with regard to their views on many

20     things, and I don't think just guns should be singled out, so I

21     would propose that the Court not ask it.

22          THE COURT:  Fine.  I don't usually ask that question,

23     so if there is an objection from the defense, I will not ask

24     it.  I do ask, "Does any juror have any opinion about the

25     enforcement of the federal murder laws or federal drug laws

H36WharC

1  that might prevent you from being a fair and impartial juror in

2  this case," which is sufficient.

3       There is another question, which is a fair question,

4  with respect to bias, which is, "Have any of you ever lobbied,

5  petitioned, or worked in any other manner for or against any

6  laws or regulations relating to the narcotics and firearms

7  policies of the United States?  If so, what did you do?"

8       OK.  "Parties and lawyers:  The defendant Cory Harris

9  is represented at this trial by Bobbi Sternheim and Grainne

10  O'Neill.  Also seated at counsel table is the defendant Cory

11  Harris.  I'll ask each of you to stand."

12       I'm sorry.

13       MS. STERNHEIM:  Mr. Harris was responding to standing,

14  and I said "not now."

15       THE COURT:  Oh.  Mr. Harris, I'm just telling you what

16  I'll do during jury selection.

17       "This action is being prosecuted by the United States

18  Attorney's Office for the Southern District of New York.  The

19  United States Attorney for this district is Preet Bharara.  The

20  conduct of the trial will be in the immediate charge of

21  Assistant United States Attorneys Hadassa Waxman, Andrew Adams,

22  and Margaret Graham.  The government will be assisted at

23  counsel table by Nicholas Pavlis, a paralegal at the United

24  States Attorney's Office, and Anthony Melchiorri, a special

25  agent of the Bureau of Alcohol, Tobacco, Firearms, and

H36WharC

```
 1   Explosives.  I'll ask all of you to stand.  "
 2              Anyone else who may be at counsel table who should be
 3   introduced?
 4              MR. ADAMS:  No one else for the government.  Thank
 5   you.
 6              MS. STERNHEIM:  Not at the defense table.
 7              THE COURT:  When will I get a witness list to put in
 8   the voir dire for the jurors?
 9              MR. ADAMS:  Your Honor, subject to the conversation
10   about 3500 disclosures, I would propose the Friday before, and
11   we can provide it early in the day.
12              THE COURT:  OK.  "Places," I have 78 Catherine Street
13   in Manhattan, 119 Henry Street in Manhattan, and 45 Rutgers
14   Street in Manhattan.  Any other places?
15              MR. ADAMS:  Your Honor, there will be reference to
16   Bennington, Vermont, which is one of the locations where
17   narcotics were trafficked in the case, generally, and I'll
18   confirm whether or not there are any specific addresses in
19   Bennington as well, but certainly Bennington, Vermont.
20              MS. STERNHEIM:  Judge, I just want to note that the
21   three addresses that were recited are just a couple of blocks
22   away, and the M15, if any of the jurors take it, because I know
23   I take it, stops right at 78 Catherine Street, so when the
24   Court admonishes the jury not to go to certain locations, I
25   just wanted the Court to be aware that that is part of travel
```

H36WharC

that may be used by some of the jurors.

THE COURT:  OK.  In my preliminary instructions, I'll
tell them, "Do not visit any place mentioned in the course of
the trial," and I'll add something which says, "You may well
pass some of the addresses you hear, but please don't go into
any of those places."  OK?

All right.  Will there be witnesses who are going to
testify with interpreters?

MR. ADAMS:  None for the government, no.

THE COURT:  So I don't need to talk to them about
following the court interpreter.

I will, of course, in the preliminary instructions,
tell the jurors not to look at or listen to anything to do with
the case, not to get or give any information; don't use any
forms of social media to get or give any information about the
case.

I also intend, after the jurors have been sworn and
after I've given them preliminary instructions, to ask them to
take an additional oath, and it goes like this:

"As I've said, I hope that for all of you this case is
interesting and noteworthy, but to underscore how serious my
instructions are on this issue, I'm going to administer an
additional oath to you, violations of which can have serious
consequences for anyone who does so, so please all of you
stand.

1          "Do each of you solemnly swear or affirm that you will

2      follow the Court's instructions, which are that until the case

3      is over you will not access in any way the news about the case,

4      either by the Internet, by print media, by radio, or by

5      television; and that you will not communicate with any others

6      about this case, including not talking about it in person or by

7      phone, not writing, blogging, or tweeting about it, and not

8      using any social networking sites, for example, Facebook,

9      MySpace, LinkedIn and Twitter, to discuss any aspect of the

10     case or your work as a juror.  If you agree, please say 'I do.'

11     Please take your seats."

12          MR. ADAMS:  That's good by the government, your Honor.

13     Thank you.

14          MS. STERNHEIM:  Your Honor, I just might suggest that

15     you add "nor visit any of the locations."

16          THE COURT:  OK.  "And that you will not visit any of

17     the locations mentioned in the course of the trial."

18          MS. STERNHEIM:  Thank you.

19          THE COURT:  Sure.

20          All right.  Remember, please, not to talk to the

21     jurors.  Please leave any place where the jurors are, and I

22     will tell the jurors that I've told you to do that and that

23     you're not being impolite when you do that; you're just

24     following my instructions.  So to make sure that what I tell

25     the jurors is accurate, I've told you now, don't talk to the

H36WharC

 1  jurors, leave any place that the jurors are in, such as

 2  elevators, lobbies, and the like.  As you know, I will always

 3  keep you here until the jury is dismissed from the courtroom,

 4  and Mr. Fletcher will tell you when the jurors have left the

 5  floor, and then you can leave.

 6          All right.  That was my list for today.  Anything else

 7  for me that you want to raise now?

 8          MS. STERNHEIM:  Just preliminarily, as the Court is

 9  aware, Mr. Harris is incarcerated, so I would ask the Court to

10  be mindful that the jury not be present when Mr. Harris is not

11  present, because bringing him in, he would come through the

12  cell block.

13          THE COURT:  Oh, yes, of course.  And I assume that you

14  will take care of appropriate clothes for Mr. Harris.

15          MS. STERNHEIM:  Yes.

16          THE COURT:  The marshals should also assure that there

17  are separate marshals for any of the witnesses who need

18  marshals.  I always have the defendant at counsel table when

19  the jury comes in or leaves, and the marshals are usually very

20  discreet, but Mr. Harris will be in the courtroom when the jury

21  comes in or leaves and will stay in the courtroom while the

22  jury is here.

23          MS. STERNHEIM:  Your Honor, just so you know, the

24  reason I'm raising that is I've had the experience recently

25  where jurors come into the courtroom when the Court reconvenes

28

1    after a break at times.

2              THE COURT:  Oh, no.

3              MS. STERNHEIM:  I just wanted to underscore that.

4    That's it.

5              THE COURT:  No, no.  Irrespective of the defendant's

6    position, my practice is that I rise and ask everyone in the

7    courtroom to rise each time that the jury comes in or leaves,

8    so we're all here when the jury comes in or leaves.  It's not a

9    situation where the jury wanders in and then I come in.

10             MS. STERNHEIM:  No, I know, your Honor, but I'm just

11   raising it.  During the jury selection, there are times when

12   jurors are mingling all around the halls and sometimes come

13   into the courtroom when they return for after-break

14   questioning.  That's the time.  I'm aware of your procedures

15   with regard to the court; I'm just raising that, when they're

16   milling around while they're still being selected.

17             THE COURT:  No, it's a good point.  Mr. Fletcher keeps

18   the jurors out of the courtroom until we're all present.

19             MS. STERNHEIM:  OK.

20             THE COURT:  And we send them out of the courtroom for

21   breaks and they're held outside of the courtroom.

22             MS. STERNHEIM:  Thank you.

23             THE COURT:  But it's a good reminder.

24             Anything else today?

25             MR. ADAMS:  No, your Honor.  We will fax over the

H36WharC

unredacted copy of the motion *in limine* as soon as we get back

to the office.  Otherwise, nothing for the government.

        THE COURT:  See you all at 10:00 tomorrow.

        MS. STERNHEIM:  Thank you.

        MR. ADAMS:  Thank you, your Honor.

        (Adjourned)